**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

|  |  |  |
|---|---|---|
| | * | |
| **WILLIAM JEFFREY KARN,** | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case No.: GJH-16-3261** |
| | * | |
| **PTS OF AMERICA, LLC,** *et al.*, | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

In this action, Plaintiff William Jeffrey Karn brings constitutional deprivation and negligence claims stemming from an extradition performed by Defendants PTS of America, LLC, Brevard Extraditions, LLC, and Brevard employee James Lebron. *See* ECF No. 40. Defendants PTS, Brevard, and Lebron have filed a Joint Motion for Summary Judgment. ECF No. 112. Defendant Lebron has also filed a Motion for Summary Judgment as to Plaintiff's claims against him in particular. ECF No. 113. A hearing on the Motions is not necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons stated below, the Court will deny summary judgment as to Plaintiff's negligence claims against all Defendants. The Court will grant in part and deny in part summary judgment on Plaintiff's constitutional deprivation claims against Defendant Lebron.[1]

---

[1] Also pending are Plaintiff's Consent Motion for Extension of Time to File a Reply, ECF No. 114, which is granted, and Plaintiff's Consent Motion for Leave to File Excess Pages, ECF No. 117, which is also granted.

Plaintiff has also filed two motions to seal. In the first, ECF No. 116, Plaintiff has filed a motion to seal exhibits 6, 7, 11, 12, and 13 of Plaintiff's Opposition to Defendant James Lebron's Motion for Summary Judgment. In the second, ECF No. 119, Plaintiff moves to seal exhibits 6, 7, 11, 12, 17, 23, 24, 26 of Plaintiff's Opposition to Defendant's PTS of America, LLC, Brevard Extraditions, LLC, and James Lebron's Joint Motion for Summary Judgment.

## I.     BACKGROUND[2]

Defendants PTS and Brevard are private prisoner and pre-trial detainee transport companies. *See* ECF No. 118-7 at 3 (Caruso Dep.). At the relevant time, Brevard was a subsidiary of PTS. *See id.* PTS maintains contracts with state sheriff offices, including, as relevant here, the Horry County Sheriff's Office in South Carolina. *Id.* at 4. PTS and Brevard are paid fees to transport prisoners and detainees between jails and prisons across the country. *Id.* On or about December 9, 2015, Plaintiff Karn was arrested in Montgomery County, Maryland, for failure to timely pay child support in Horry County, South Carolina. *See* ECF No. 113-3 at 29 (Karn Dep.). Karn waived extradition to South Carolina. *Id.* at 28, 29. Karn was detained in Montgomery County for two weeks until his extradition. *Id.* at 17, 27. On December 23, 2015, Jorge Santiago, a PTS employee and non-party, and Defendant Lebron, a Brevard employee, arrived in a transport van to collect Plaintiff. ECF No. 113-3 at 36, 116; ECF No. 115-8 (Activities Log).

Over the course of nine days, Plaintiff was transported through Maryland, West Virginia, Kentucky, Tennessee, and South Carolina. ECF No. 118-7 at 4, 15–18, 21–23; ECF No. 115-8 at 3–6. The van stopped at various jail and prison facilities to pick up and drop off other detainees or prisoners along the way to Plaintiff's destination. *Id.* Plaintiff reached the end of his journey, the J. Reuben Long Detention Center in Horry County, South Carolina, on December 31, 2015.

---

This Court entered a Stipulated Confidentiality Order requiring that all motions and related documents containing confidential information be filed under seal. *See* ECF No. 27. These exhibits have been designated as confidential. Plaintiff's motions to seal are granted.

[2] These facts are either undisputed or viewed in the light most favorable to the Plaintiff as the non-moving party. Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

ECF No. 113-3 at 127, 144; ECF No. 115-8 at 6. Defendants PTS and Brevard were paid $350 for transporting him. ECF No. 118-7 at 4.

### A.  Plaintiff's Allegations

Plaintiff Karn was transported from Maryland to South Carolina over the course of nine days. *See* ECF No. 118-1 at 8. Plaintiff attests that he endured a disturbing and dehumanizing experience in the custody of Defendants, which he supports with affidavits from fellow passengers on the van, *see* ECF No. 115-3 ¶ 39 (Spina Aff.); ECF No. 115-5 ¶ 17 (Loud Aff.).

When he was awaiting extradition in Maryland, Plaintiff was told that U.S. Marshals would transport him to South Carolina. ECF No. 113-3 at 28. Instead, on December 23, 2015, Santiago and Defendant Lebron arrived to transport him. *Id.* at 36; *see also* ECF No. 115-8 at 3. Santiago and Lebron transported Plaintiff from Montgomery County, Maryland to a jail in Christian County, Kentucky from December 23, 2015 through December 24, 2015. ECF No. 115-8 at 4.[3]

Plaintiff attests that, before first getting into the van, he was restrained in excessively tight handcuffs, which were not loosened for the entirety of the trip despite his frequent requests. *See* ECF No. 113-3 at 41, 42, 44. Plaintiff states that the tight handcuffs caused numbness, pain, and bruising during the trip. *Id.* Plaintiff attests that the van itself was overcrowded and filthy, a "cesspool" of human waste. *Id.* at 44, 73. When Plaintiff entered the van, around twelve people were already there, including a woman being held in a segregation cage. *Id.* at 49. Plaintiff was not sure if they were other pre-trial detainees, like himself, or if some were prisoners. *Id.* at 53. He asserts that at least some of the passengers were "hardened" criminals and were either charged with or convicted of serious crimes. *Id.*

---

[3] In his deposition, corporate designee Frank Caruso explained that Brevard and PTS were "sharing assets for employees and vehicles at that time." ECF No. 118-7 at 10.

The seating was on metal benches along the sides of the van, with no padding and no seatbelts. *Id.* at 35, 46. Plaintiff states that, while the van was already dirty when he entered, it increasingly filled up with human waste and trash over the course of the journey to Kentucky. *See id.* at 44, 74. Plaintiff describes "urine bottles rolling back and forth hitting the . . . walls, pee on the floor, food flies. The flies would drive you crazy." *Id.* at 74.

Plaintiff claims that he and the other transportees were denied bathroom breaks and that Defendant Lebron and Santiago ordered the transportees to use plastic water bottles and bags as toilets instead. *Id.* at 59, 68, 70, 76. Plaintiff was also denied any opportunity to wash and, after one incident where he attempted to help another passenger use a bag as a toilet, he was covered in human waste. *Id.* at 56, 59, 68, 69. Plaintiff also says that he was denied adequate food and water, as the guards either did not buy enough food or his food was stolen by other passengers. *Id.* at 133. He complained to the guards about the lack of food and was told that it was "not [the guard's] problem." *Id.* at 133.

The van drove through the night, so there was no opportunity to sleep. *Id.* at 94. Plaintiff remained tightly chained and uncomfortable while sitting on the metal bench, and other passengers were often loud and aggressive. *Id.* Plaintiff claims that Defendant Lebron and Santiago took turns driving the van, and each drove dangerously and erratically. *See id.* at 189. Plaintiff asserts that he was "scared to death" by the excessive speeds and reckless driving and that he was frequently thrown off the bench. *Id.* Plaintiff claims that he was nauseated throughout the trip and vomited at one point. *See id.* at 79.

Plaintiff was assaulted by fellow passengers and subject to verbal abuse from both the other passengers and the guards. *Id.* at 67, 68, 117. Plaintiff states that at one point, after some passengers began to fight, both guards opened the back door and indiscriminately sprayed pepper

4

spray at all the passengers. *Id.* at 117, 118. Plaintiff claims that he was not given water or medical attention afterwards. *Id.* Plaintiff also states that, when he was allowed off the van in West Virginia to use the restroom in a jail facility, he fell out of the van directly onto his shoulder and injured himself. *Id.* at 61, 62. Plaintiff had lost feeling in his legs from being cramped and restrained for so long. *Id.* One guard observed him and ordered him to get up, offering no help. *Id.* Plaintiff asserts that he still has pain in this shoulder. *See id.* at 158.

When Plaintiff got off the van at a "hub" facility in Christian County, Kentucky, on the afternoon of December 24, he states that his hands had "purple and blue rings around both wrists." *Id.* at 88.[4] He was exhausted and filthy. *See id.* at 89.  Plaintiff was processed into this hub facility, ECF No. 118-7 at 18, which is where he was held for several days before being picked up by a different van to continue to South Carolina, ECF No. 115-8 at 8. Plaintiff asserts that his family had no idea where he was, and he was not allowed to contact anyone. ECF No. 113-3 at 104.

On December 29, 2015, Plaintiff was picked up by guards King and Cabrera, non-parties here, who transported him to South Carolina. ECF No. 115-8 at 5; *see also* ECF No. 113-3 at 103. After an overnight stop in Tennessee on December 30, Plaintiff was dropped off at the detention facility in Horry, South Carolina on December 31, 2015. ECF No. 113-3 at 127, 140, 143, 144. Plaintiff states that, like the first leg of the trip, King and Cabrera also denied regular restroom breaks and there was frequent fighting amongst the passengers. *See* ECF No. 113-3 at 126, 128, 130, 131. He also states that this second van was also filthy, he was tightly restrained, and he was given no adequate opportunity to clean himself and had to wear his filthy clothes

---

[4] Plaintiff states that, before getting to Christian County, Kentucky, one of the transporting officers was dropped off at the airport, whom he asserts was Santiago. *See* ECF No. 113-3 at 115, 116. Defendant Lebron then drove the van alone the rest of the way. *Id.*

from the first leg of the trip. *Id.* at 114, 133. He also states that, at one point, he and the other passengers were denied food and water for a period of 10 hours because the guards missed the correct exit. *Id.* at 128.

Plaintiff claims that it is PTS and Brevard's business model to "keep the vans as full as possible in order to maximize their profits, which results in long, circuitous, and indirect transports to pick up prisoners, in which detainees are frequently forced to attempt to sleep overnight in the vans." ECF No. 115-1 at 9. A direct trip from Maryland to South Carolina normally would take eight hours and around 400 miles. *See* ECF No. 118-7 at 23. However, Plaintiff's transportation took nearly nine days, and he was transported over 2,000 miles. ECF No. 115-1 at 9.

Plaintiff asserts that he still has some difficulty using his hands, which affects his ability to play instruments, and he still has pain in his shoulder. ECF No. 113-3 at 157, 158, 159. Plaintiff also developed boils from sitting and being restrained for so long, and asserts that he still suffers from depression, Post Traumatic Stress Disorder, and difficulty sleeping from the nightmarish trip. *Id.* at 173, 186, 187, 192.

**B. Defendants' Responses**

Defendants PTS, Brevard, and Lebron jointly dispute Plaintiff's version of events, particularly the severity of Plaintiff's claims. *See* ECF No. 112-2 at 6. Defendants respond that Plaintiff was adequately provided with restroom opportunities, that, at most, Plaintiff missed one or two meals, that no transporting guard told Plaintiff to use a water bottle to urinate, that the van was not driven recklessly because it was never involved in an accident, and that, even if chemical agents were deployed, Plaintiff admitted that the other passengers had been fighting, which necessitated force. *See id.* at 7, 8, 10.

Defendant Lebron also disputes Plaintiff's version of events. In his deposition, Lebron stated that he regularly cleaned the vans, that passengers were given adequate water, food, and bathroom breaks, and that he did not recall any incidents involving chemical agents. *See* ECF No. 113-6 at 34, 50, 54, 82 (Lebron Dep.). Additionally, Lebron disputes that he was personally involved in Plaintiff's constitutional claims. ECF No. 113-2 at 20.

### C.  Procedural History

Plaintiff filed a Complaint against Defendant PTS and six "John Doe" employees on September 26, 2016, asserting claims of negligence, intentional infliction of emotional distress, negligent hiring, training, and supervision, false imprisonment, violations of the Maryland Declaration of Rights, and claims under 42 U.S.C. § 1983 for violations of the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ECF No. 1. PTS moved to dismiss all claims except the negligence claim, for which it filed a partial Answer. ECF Nos. 9, 10. Plaintiff withdrew the false imprisonment claim and one of the § 1983 claims in his Opposition. *See* ECF No. 21 n.1. In a Memorandum Opinion issued on September 19, 2017, the Court dismissed all of the remaining claims except for the Fourteenth Amendment claim against the John Doe employees in their personal capacities. *Id.* at 16–19. The Court stated that Plaintiff would have the opportunity in discovery to identify the individual employees and amend his pleading to add specific allegations against them. *Id.* at 16 n.5.

Plaintiff moved for leave to file an Amended Complaint on April 17, 2018. ECF No. 32. The proposed Amended Complaint added four individual defendants and Brevard and included five claims: negligence against all Defendants (Count I), a § 1983 claim against PTS, Brevard, and the employees in their official capacities (Count II), a § 1983 claim against the individual employees in their individual capacities (Count III), a claim for violations of the Maryland

Declaration of Rights (Count IV), and a claim of negligent training, supervision, and retention against PTS and Brevard (Count V). ECF No. 32-1.

On July 26, 2018, the Court issued an Order and Memorandum Opinion granting the Motion for Leave to Amend as to all claims except the Maryland Declaration of Rights claim. ECF Nos. 38, 39. The Amended Complaint was therefore docketed as the operative pleading. ECF No. 40. On August 10, 2018, PTS submitted a motion challenging the venue of the action as improper or in the alternative requesting transfer of venue to the U.S. District Court for the Middle District of Tennessee. ECF No. 49. Brevard and Lebron then filed Motions to Dismiss the Amended Complaint, ECF Nos. 55, 64, and Cabrera and King filed a Motion to Dismiss the Amended Complaint for lack of personal jurisdiction and improper venue, ECF No. 65. On February 11, 2019, the Court issued an Order and Memorandum Opinion denying all of the pending motions. ECF Nos. 71, 72. However, it denied Cabrera's and King's motion without prejudice. The Court granted Plaintiff's request to conduct limited discovery for 60 days on Cabrera and King's activities in Maryland and to show cause why they should not be dismissed for lack of personal jurisdiction. *Id.* at 12.

On May 28, 2020, this Court granted Defendants Cabrera and King's motions to dismiss for lack of personal jurisdiction. ECF Nos. 97, 98. This Court also noted that Santiago had never been served, so it did not address jurisdiction over him. *See* ECF No. 97 at 5 n.3. This Court also granted Defendants' Joint Motion to Bifurcate and Stay Discovery with respect to Count II, or the Section 1983 claim against PTS and Brevard. ECF No. 98.

On July 2, 2021, Defendants PTS, Breyard, and Lebron filed the Joint Motion for Summary Judgment as to Count I (Negligence), III (Section 1983 claims in a personal capacity), and V (Negligent Training, Retention, or Supervision) of the Amended Complaint. ECF No. 112.

On the same day, Defendant Lebron filed a Motion for Summary Judgment as to Counts II (Section 1983 in official capacity) and III (Section 1983 in individual capacity) of the Amended Complaint. ECF No. 113. Plaintiff has filed responses in opposition to both motions, ECF Nos. 115, 118, and Defendants have replied, ECF Nos. 122, 123.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" Fed. R. Civ. P. 56(a); *see also Celotex Corp. v Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23.

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. liberty Lobby. Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only genuine if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). When ruling on a motion for summary

judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.    DISCUSSION

Three causes of action are currently before the Court: (1) negligence against all Defendants; (2) negligent supervision, retention, and training against Defendants PTS and Brevard; and (3) constitutional deprivation against Defendant Lebron in a personal capacity.[5]

### A.  Negligence Against All Defendants

Plaintiff asserts a claim of negligence against all Defendants. ECF No. 40 at 29. Plaintiff asserts that, at all times, the transporting guards were acting within the scope of their employment with Defendants PTS and Brevard. *Id.* ¶ 108. Maryland law applies to Plaintiff's state law claims.[6]

To state a claim for negligence, a plaintiff must show "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Remsburg v. Montgomery*, 376 Md. 568, 582, 831 A.2d 18, 26 (2003) (internal quotations and citations omitted). Maryland has adopted a characterization of "duty" as "an obligation, to which the law will give recognition and effect, to conform to a

---

[5] The Court does not analyze whether summary judgment can be granted as to the constitutional claims against Defendants PTS, Brevard, and Lebron in an official capacity because, as this Court ordered earlier, Count II was bifurcated and discovery on that issue was stayed. *See* ECF Nos. 97, 98.

[6] The Court applies Maryland law to Plaintiff's negligence and negligent supervision claims. "Maryland adheres to the lex loci delicti rule in analyzing choice of law problems with respect to causes of action sounding in tort." *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008). "Maryland law is clear that in a conflict of law situation, . . . where the events giving rise to a tort action occur in more than one State, we apply the law of the State where the injury[,] the last event required to constitute the tort[,] occurred." *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 620, 925 A.2d 636, 648–49 (2007) (internal quotations omitted). "[A]n injury is deemed to occur where the plaintiff first suffers harm, even if the tortious conduct subsequently results in additional or more severe harm elsewhere." *Williams v. Gyrus ACMI, Inc.*, 790 F. Supp. 2d 410, 414 (D. Md. 2011) (citing *Burnside v. Wong*, 412 Md. 180, 986 A.2d 427, 438 (2010)).

particular standard of conduct toward another[.]" *Id.* (quoting Prosser and Keeton on Torts § 53 (W. Keeton 5th ed. 1984)). Here, the parties do not seem to dispute that Plaintiff was owed a duty. Instead, their dispute centers on the applicable "standard of care" imposed by that duty. *See* ECF No. 112-2 at 13. Thus, the Court addresses the standard of care issue before turning to the substance of the negligence claim.

## 1. Standard of Care

The Court will address three issues before getting to the substance of the negligence claim: first, whether Plaintiff is required to establish the applicable standard-of-care through expert testimony; second, whether Plaintiff's expert is qualified to expound a standard of care, and third, whether the expert's opinions are relevant and reliable as to establishing that standard of care.

Defendants argue that the standard of care applicable to prisoner transportation is beyond the ken of an average person and thus, Plaintiff must establish the standard with expert testimony. ECF No. 112-2 at 13.

Maryland courts have recognized that while "there may be instances in which the negligence is so gross or that which was done so obviously improper or unskillful as to obviate the need for probative testimony as to the applicable standard of care, . . . generally there must be produced expert testimony from which the trier of fact can determine the standard of skill and care ordinarily exercised by a professional man of the kind[.]" *Crockett v. Crothers*, 264 Md. 222, 224–25, 285 A.2d 612, 614 (1972); *see also Am. Strategic Ins. Corp. v. Scope Servs., Inc.*, No. 15-cv-2045-PX, 2017 WL 4098722, at *2 (D. Md. Sept. 15, 2017) ("Expert testimony is generally required to establish the standard of care 'when the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average

laymen.'") (quoting *Jones v. Godfrey*, No. 04-cv-3370-RWT, 2008 WL 1701088 at *13 (D. Md. Mar. 3, 2008)). "If the plaintiff presents no expert when one is needed, then the trial court 'may rule, in its general power to pass upon the sufficiency of the evidence, that there is not sufficient evidence to go [to] the jury.'" *Jones v. State*, 425 Md. 1, 26, 38 A.3d 333, 348 (2012) (quoting *Rodriguez v. Clarke*, 400 Md. 39, 71, 926 A.2d 736, 755 (2007)).

Maryland courts have required expert testimony when the alleged negligence involves specialized procedures that a jury cannot be expected to appreciate without the assistance of expertise. *See, e.g.*, *Schultz v. Bank of Am., N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1085–86 (2010) (expert testimony required when the "case involved alleged negligence in regard to internal bank procedures that the trier of fact could not be expected to appreciate without the aid of expert testimony."). Here, determining whether Defendants acted negligently towards Plaintiff requires knowledge of restraints, security and escape prevention measures, and general knowledge about the care, custody, and transportation of pre-trial detainees and prisoners. That knowledge is not likely to be within the scope of knowledge of an average person.

In addition, this Court is persuaded by the reasoning of other courts that found that expert testimony is required in analogous cases. *See, e.g.*, *Villalobos v. Bd. of Cty. Comm'rs of Doña Ana Cty.*, 322 P.3d 439, 441 (N.M. 2014) (While "a case in which an expert is not necessary to establish negligence in a prison context may exist, it is not this case" because plaintiff needed to show "the standard of care for the monitoring of inmates, jail design, video surveillance[.]"); *see also Hughes v. D.C.*, 425 A.2d 1299, 1303 (D.C. 1981) ("[A] reasonably prudent juror cannot be expected to appreciate the ramifications of prison security as well as the parallel considerations

involving the safekeeping of prisoners, and therefore, whether, under given circumstances, reasonable care was exercised.") (citing *Matthews v. D.C.*, 387 A.2d 731, 735 (D.C. 1978)). [7]

Plaintiff argues that a jury could recognize Defendants' negligence without expert testimony. *See* ECF No. 118-1 at 31. Generally, to fall into Maryland's exception to the expert testimony rule, the negligence must be "so obviously shown that the trier of fact could recognize it without expert testimony." *Schultz*, 990 A.2d at 1086. The negligence must be "gross" or "obviously improper or unskillful." *See Crockett*, 285 A.2d at 614. For example, "an expert witness is not needed to explain the standard of care in cases where a dentist extracts the wrong tooth, a doctor amputates the wrong arm or leaves a sponge in a patient's body, or an attorney fails to inform his client that he has terminated his representation of the client." *Schultz*, 990 A.2d at 1087 (citing *Cent. Cab Co. v. Clarke*, 259 Md. 542, 551, 270 A.2d 662, 667 (1970)).

To be certain, Plaintiff's claims evince horrid conditions that a lay juror can appreciate as such; however, an expert would be necessary to determine the level of care possible given the need for security and to prevent escape while transporting detainees and prisoners over a long distance. Thus, Plaintiff is required to present expert testimony to establish what constitutes a reasonable standard of care. *See Am. Strategic Ins. Corp. v. Scope Servs., Inc.*, 2017 WL 4098722, at *7.

---

[7] This Court has not found a case in Maryland, nor in the Fourth Circuit, where the court conclusively resolved whether expert testimony was required in a factually analogous case. Plaintiff cites to *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 388 (W.D. Va. 2020), in support, a factually analogous case, but there, the court was applying Virginia law. In addition, the court ruled that the plaintiff did not need expert testimony to establish causation and damages because those are generally "questions of fact to be resolved by a jury." *Id.* Here, the Court examines whether expert testimony is necessary to establish a standard of care, a question that goes to duty and to breach of that duty.

The Court must next determine whether Plaintiff's proffered expert is qualified. Expert qualification is governed by Federal Rule of Evidence 702.[8] "[C]ourts should be conscious of two guiding, and sometimes competing principles: Rule 702 was intended to liberalize the introduction of relevant expert evidence [and] expert witnesses have the potential to be both powerful and quite misleading." *Hickerson v. Yamaha Motor Corporation*, 882 F.3d 476, 481 (4th Cir. 2018) (internal quotations omitted). "[A] trial judge has a great deal of discretion in deciding whether to admit or exclude expert testimony." *United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995). "[A] witness must be qualified as an expert by knowledge, skill, experience, training, or education." *Am. Strategic Ins. Corp.*, 2017 WL 4098722, at \*3 (citing Fed. R. Evid. 702). "When a party challenges an expert's qualifications, 'the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'" *Id.* (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

Plaintiff has proffered the testimony of expert Ron McAndrew. *See* ECF Nos. 118-14 (McAndrew Dep.), 118-15 (McAndrew Report). McAndrew has extensive experience in the corrections field. *See* ECF 118-16 (McAndrew Background). McAndrew started his career as a correctional officer before, in 1992, being promoted to assistant warden and then warden of several large prisons in Florida. *Id.* at 3. McAndrew then worked as the interim director of a Florida state jail. *Id.* In 2005, McAndrew transitioned to prison and jail consulting. ECF No. 118-15 at 1. In addition, McAndrew stated that he had, when needed, served as a prisoner transport officer and had received incoming prisoners daily as a deputy warden. *Id.* at 3. Finally,

---

[8] Evidence issues are governed by the federal rules. *See Am. Strategic Ins. Corp. v. Scope Servs., Inc.*, No. 15-cv-2045-PX, 2017 WL 4098722, at \*2 n.1 (D. Md. Sept. 15, 2017) ("Although Plaintiff's negligence claim sounds in Maryland common law, the Federal Rules of Evidence apply to questions of expert admissibility.") (citing *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1054 (4th Cir. 1986)).

McAndrew has received training in Inmate Supervision and Transport at the Florida Department of Law Enforcement. ECF No. 118-16 at 5. McAndrew is also a member of professional associations, including the American Correctional Association and the American Jail Association. *Id.*

Defendant objects that McAndrew has no expertise in private prison transportation and is thus unqualified; however, Rule 702 does not create "a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts. Life and the legal cases that it generates are too complex to warrant so definitive a match." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999); *Am. Strategic Ins. Corp.*, 2017 WL 4098722, at *3 (The "fit between an expert's specialized knowledge and experience and the issues before the court need not be exact"). McAndrew's extensive experience in the field of corrections, including actual experience as a transport officer, is more than sufficient to qualify McAndrew as an expert qualified to opine on the applicable standard of care that applies to detainee and prisoner custody and transportation.

Defendant also argues that McAndrew acknowledges a lack of understanding of Jeanna's Act and is thus unqualified. *See* ECF No. 112-2 at 18. Jeanna's Act, or the Interstate Transportation of Dangerous Criminals Act of 2000, 34 U.S.C. § 60103, requires that the Attorney General, in consultation with the American Correctional Association, promulgate regulations "relating to the transportation of violent prisoners in or affecting interstate commerce." The Act sets "minimum security and safety standards" for the transportation of violent criminals, *see* 28 C.F.R. § 97.1, but the Act does not permit "stricter standards with respect to private prisoner transport companies than are applicable, without exception, to the United States Marshals Service, Federal Bureau of Prisons, and the Immigration and

Naturalizations Service when transporting violent prisoners under comparable circumstances[,]" 34 U.S.C. § 60103. Regulations promulgated under the Act govern the use of restraints, employee training, and pre-employment screening for guards. *See* 28 C.F.R. §§ 97.11, 97.12, 97.13. The regulations also set some guidelines for the safety of the transportees themselves but private companies also "must comply with applicable state and federal laws[.]" *See* 28 C.F.R. § 97.20.

Jeanna's Act is certainly relevant to the "standard of care" in the private prisoner transportation industry, but the Act does not set comprehensive health and safety standards, nor does it require stricter standards than those set by federal guidelines.[9] The regulations also specifically refer to compliance with applicable state and federal laws. This Court is also persuaded by the reasoning in *Kovari*, in which the court found that a lack of close familiarity with Jeanna's Act was not "fatal" to the expert's testimony: "[Defendant] may attempt to discredit [expert] testimony on the comparison of regulations that apply to private transport to those that apply to federal transport on cross-examination." *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 373–74 (W.D. Va. 2020). In addition, in his deposition, McAndrew stated that he was aware of Jeanna's Act. *See* ECF No. 118-14 at 30.

Given McAndrew's extensive experience and training in the field of corrections, this Court finds that McAndrew is qualified to testify as an expert as to the applicable standard of care in the custody and transportation of pre-trial detainees and prisoners.

---

[9] The Court notes here that Jeanna's Act specifically applies to the private transportation of violent prisoners, *see* 34 U.S.C. § 60103, and Plaintiff was a non-violent pre-trial detainee. However, given that pre-trial detainees and violent prisoners are often transported together, Jeanna's Act, and its associated regulations, are relevant to determining the appropriate standard of care. *See, e.g.*, *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 373 (W.D. Va. 2020); *Schilling v. TransCor Am., LLC*, 2012 WL 3257659, at *2 (N.D. Cal. Aug. 8, 2012).

Finally, the Court must determine if Plaintiff's proposed expert's opinions are relevant and reliable for the purpose of establishing a standard of care. "Rule 702 permits expert testimony if that testimony is (1) helpful to the jury in understanding the evidence or determining a fact at issue, (2) 'based on sufficient facts or data,' (3) 'the product of reliable principles and methods,' and (4) the product of a 'reliabl[e] appli[cation] of th[ose] principles and methods to the facts of the case.'" *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting Fed. R. Evid. 702). Expert testimony is admitted if it "rests on a reliable foundation and is relevant[.]" *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 597 (1993). McAndrew offered opinions in his report and in his deposition regarding the transportation of detainees and prisoners, *see* ECF Nos. 118-14 at 30, 35, 118-15 at 8, so his opinions are relevant.

McAndrew's opinions must also be reliable. "*Daubert* provides four, non-exhaustive 'guideposts' to aid in the required reliability analysis: (1) whether the expert's theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error' inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise." *Sardis*, 10 F.4th at 281 (citing *Nease v. Ford Motor Co.*, 848 F.3d 219, 228 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786)). "But this list 'neither necessarily nor exclusively applies to all experts or in every case,' as the relevance of some factors can 'depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Sardis*, 10 F.4th at 281.

A court is obligated to act as a gatekeeper for expert opinions, but, generally, the "traditional and appropriate means" of challenging expert testimony are "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."

*Glass v. Anne Arundel Cty.*, 38 F. Supp. 3d 705, 714 (D. Md. 2014), *aff'd*, 716 F. App'x 179 (4th Cir. 2018). Accordingly, "[t]he court need not determine that the expert testimony is irrefutable or certainly correct." *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006), *overruled on other grounds*, *United States v. Foote*, 784 F.3d 931 (4th Cir. 2015).

Not all *Daubert* factors are always applicable. *See Sardis*, 10 F. 4th at 281 (noting that "trial courts are typically given 'broad latitude' to determine which of these factors (or some other unspecified factors) are 'reasonable measures of reliability in a particular case.'") (quoting *Nease*, 848 F.3d at 229). The Fourth Circuit allows "experiential expert testimony[.]" *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). In examining experiential testimony, "the district court must nonetheless require an experiential witness to 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'" *Id.* (quoting Fed. R. Evid. 702 Advisory Committee notes); *see also Kumho*, 526 U.S. at 137 (noting that experience in conjunction with other knowledge, training, or education can provide a sufficient foundation for expert testimony).

In his report, McAndrew explains that he reviewed the Complaint, depositions, the PTS Basic Transport Officer Course,[10] employee records, PTS policy, PTS transport logs, and pepper spray decontamination procedures. ECF No. 118-15 at 5. McAndrew wrote in his report that, in his professional opinion, PTS and Brevard's policy of not obtaining medical releases of passengers essentially allowed the use of chemical agents without restriction and was a violation of industry standards. ECF No. 118-15 at 8. McAndrew opined that "it is beyond correctional comprehension." *Id.* He noted in his deposition and his report that it is standard to determine whether transportees are "medically cleared" before using chemical agents. ECF No. 118-14 at

---

[10] The U.S. Prisoner Transport Basic Transport Officer Course, provided as an exhibit, is part of PTS's training material. *See* ECF No. 118-13.

12. He also opined that a failure to properly inventory the agents "violates the industry standards." ECF No. 118-15 at 8. He also cites to recommendations regarding cleaning after use of chemical agents, which include "open[ing] all windows . . . for maximum ventilation" and "flush[ing] eyes[.]" ECF No. 118-15 at 8.

McAndrew also opined that the transport of prisoners requires inmates to be secured by hand and feet restraints. *See* ECF No. 118-15 at 9. However, McAndrew also noted that "applying restrain[t]s too tightly and refusing to readjust such restraints after being advised" is, among other violations, against "federal law" that "prohibits such punishment or abuse." *Id.* at 9. In his deposition, McAndrew stated that it is "well-known" and "the training of correctional officers throughout this country" that the improper use of restraints can "cause a person to lose their hands[.]" ECF No. 118-14 at 35. In addition, McAndrew also opined that a policy that requires prisoners to urinate and defecate while on the van is a violation of the standard of care. *See* ECF No. 118-15 at 9. "Intentionally enforcing such a practice violates the health and safety of the inmates in their care, the industry standards, and the inmate's civil rights. Such actions are beyond correctional comprehension." *Id.* McAndrew opined that transportees should be allowed access to a bathroom every four or five hours. *See* ECF No. 118-14 at 12. Finally, overall, McAndrew asserted that transport guards have an "obligation for the care, control, supervision, accountability, and safety of the inmates in their custody." ECF No. 118-15 at 9.

This Court finds that McAndrew has adequately expounded a reliable and relevant standard of care. An expert opining on a "standard of care" is not necessarily required to specifically outline that standard, especially in an action such as this one where "standard of care" holds a more amorphous definition. Instead, the traditional means of testing standard of care testimony is cross-examination. *See Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A.,*

785 F.2d 1154, 1162 (4th Cir. 1986) ("Should the witness later fail to adequately define or describe the relevant standard of care, opposing counsel is free to explore that weakness in the testimony. The trier of fact may then choose to discount the testimony.").

Here, McAndrew did identify how transport staff should undertake their duty to transportees. McAndrew gave opinions on bathroom breaks, use of restraints, and use of chemical agents—all aspects of the custody and transportation of detainees and prisoners. Taken together, these opinions make up McAndrew's standard of care opinion. *See, e.g., Friendship Heights Assocs.*, 785 F.2d at 1162 (noting that "describing the steps or guidelines that the architect should follow . . . would appear to be an acceptable way of defining the relevant professional standard of care under Maryland law."); *Kovari*, 461 F. Supp. 3d at 374 (noting that an expert may introduce "best practices" to show the "wide chasm between Defendants' policies and practices and best practices in the prison transport industry").

McAndrew's testimony is also reliable. In his deposition, McAndrew referenced the American Correctional Association and its "nationally recognized standards that have been tested in courts all across the country," and he also referenced his extensive experience as a correctional officer. *See* ECF No. 118-14 at 31, 32. He also referenced federal laws and regulations. *See* ECF No. 118-15 at 8, 9. Experience and knowledge of federal laws and regulations provide adequate bases for an expert opinion. *See Wilson*, 484 F.3d at 274 ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.") (internal quotations omitted). Thus, Plaintiff may rely on McAndrew's testimony to establish an applicable standard of care.[11]

---

[11] Because the Court finds that McAndrew's testimony is adequate, it does not consider Plaintiff's alternative argument that rebuttal expert Eric Clark may also testify to the applicable standard of care. *See* ECF No. 118-1 at 46.

### 2.   Substance of the Negligence Claims

Finally, the Court turns to whether Plaintiff has established a dispute of material fact as to the substance of his negligence claims. *See Remsburg*, 376 Md. at 582 (outlining the elements of negligence as duty, breach, causation, and injury). Plaintiff asserts that Defendants had a duty to care for him during his transportation, and he provides the expert testimony of McAndrew to establish the scope of that duty. *See* ECF Nos. 118-14, 118-15.

Plaintiff also asserts that Defendants breached that duty. ECF No. 118-1 at 7. The first leg Plaintiff's trip took place from December 23, 2015 until December 24, 2015, as the van drove from Montgomery County, Maryland, until Christian County, Kentucky. *See* ECF No. 113-3 at 36, 57, 87. During that first portion, Defendant Lebron and Santiago oversaw the transport. ECF No. 113-3 at 115, 116; *see also* ECF No. 115-8 at 3, 4. Plaintiff was then held at a detention facility in Christian County while he waited for the next transport. *See* ECF No. 118-7 at 20. The second leg of the trip took place from December 29, 2015 until December 31, 2015, during which Cabrera and King drove the van from Kentucky to South Carolina. *See* ECF No. 118-7 at 20, 21; ECF No. 115-8 at 7, 8.

All told, Plaintiff spent nine days being transported from Maryland to South Carolina. Plaintiff asserts that Defendants breached their duty of care to him through the unreasonable use of restraints and chemical spray, lack of food, water, sleep, and bathroom facilities, unsafe driving, and lack of sanitary conditions. He also asserts that he was at risk from the conduct of the other passengers and that the van was driven dangerously. He also asserts that he suffered physical and mental injuries directly attributable to the negligent conduct.[12]

---

[12] The Court notes that some of Plaintiff's assertions go only to the first leg of the trip: that the guards used pepper spray indiscriminately, that Plaintiff was injured by falling out of the van, and that Plaintiff was covered in human waste. Plaintiff also stated that the reckless driving mainly happened during the first leg of the trip. *See* ECF No. 113-3 at 56, 118, 133, 144, 189.

To support his claims, Plaintiff provides his own testimony of the incidents, as well as affidavits from his fellow passengers, which largely support his allegations. *See* ECF Nos. 113-3 (Karn Dep.), 115-3 (Spina Aff.), 115-4 (Laroque Statement), 115-5 (Loud Aff.). He also provides the Activities Log of the guards, which provides support for his allegations that the van drove through the night, that there were few bathroom breaks, and that the guards took long, circuitous routes to pick up passengers. *See* ECF No. 115-8.

Defendants agree that they had a duty of care to Plaintiff, but they challenge the contours of that duty and whether they breached that duty. Defendants also aver that McAndrew's opinion lacks a factual basis for his opinions, and thus Plaintiff cannot show a breach of the standard of care. ECF No. 112-2 at 19.

McAndrew has opined that, assuming the truth of Plaintiff's allegations, Defendants breached the normal standard of care through the lack of sanitation, bathroom breaks, food, water, and use of restraints and chemical agents. ECF No. 118-15 at 4, 8, 9. While McAndrew may not testify as to the specific facts of Plaintiff's transport, as he lacks personal knowledge, he is certainly able to opine on when certain scenarios would breach the standard of care. *See, e.g.*, *Kovari*, 461 F. Supp. 3d at 374 (explaining that an expert "opinion is valid as long as he is being asked to apply his personal knowledge and experience to hypothetical scenarios."); *see also* Fed. R. Evid. 702(a) (helpful expert testimony "will help the trier of fact to understand the evidence").[13] In response, Defendants may challenge McAndrew's testimony. *See Glass*, 38 F.

---

[13] For this reason, McAndrew's opinions "as to whether the transport stopped for meals as required" and "the speed in which the van traveled," ECF No. 118-15 at 9, would not be admissible, as these are factual opinions not based on McAndrew's expertise or perception, *see Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 376 (W.D. Va. 2020) (noting that "[expert] has no personal knowledge of the conditions of the transport and cannot testify as to their existence. [The defendant] cannot introduce lay opinion dressed as expert testimony.") (citing *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010)).

Supp. 3d at 716 ("[O]bjections to [expert's] conclusions from his calculations—and to [the] failure to take other data into account—go to the weight of the report, not its admissibility, and may be challenged on cross-examination."). Thus, there remains a dispute of fact as to both duty and breach.

Defendants also argue that Plaintiff only shows "de minimis" harm. *See* ECF No. 112-2 at 23, 25. But Plaintiff states that he suffered far more than de minimis harm—Plaintiff says that he suffered injury to his hands and his shoulder and that he suffered such horrific conditions that he still experiences depression, anxiety, traumatic flashbacks, and difficulty sleeping. *See* ECF No. 113-3 at 186, 191, 192; *see also Vance v. Vance*, 286 Md. 490, 500–01, 408 A.2d 728, 733–34 (1979) (noting that, while a plaintiff's "emotional distress" must manifest in a "physical injury" to be compensable, "physical injury" includes depression, anxiety, and inability to work or sleep). Plaintiff has also established a dispute of fact as to the cause of his injuries, as he states that they were directly and foreseeably attributable to his treatment in the van. *See id.* at 157, 158, 186. Plaintiff has met his burden on both injury and causation. *See, e.g., Kovari*, 461 F. Supp. 3d at 389 (finding that plaintiff "has met the bar to put the fact of injury and causation in dispute" because "at a minimum, he was hospitalized at the end of his transport.").

Because Plaintiff has met his burden at this stage as to the elements of negligence, and because Defendants PTS and Brevard admit the agency of their employees, ECF No. 112-2 at 31, summary judgment is denied as to negligence claims against PTS and Brevard.

Lastly, Defendant Lebron argues that Plaintiff has not established that Lebron himself was responsible for the negligent conduct. ECF No. 113-2 at 4. Lebron argues that Plaintiff "does not know which guard committed which alleged act," and thus summary judgment must be granted as to negligence claims against Lebron in particular. *Id.* But Lebron was one of only two

officers overseeing Plaintiff's trip from Maryland to Kentucky, a trip during which Plaintiff attests that he suffered through unsanitary conditions, violence from other passengers, lack of adequate food, water, sleep, and bathroom facilities, excessively tight handcuffs, unreasonable use of pepper spray, and dangerous driving. Plaintiff has adequately shown that Lebron was involved in Plaintiff's transportation, and thus Defendant Lebron himself may be liable for any negligent conduct from December 23 through December 24. For these reasons, summary judgment is denied as to Plaintiff's negligence claim against all Defendants.

### B. Negligent Training, Supervision, and Retention Against Defendants PTS and Brevard

Plaintiff also asserts a claim of negligent training, supervision, and retention against Defendants PTS and Brevard. Maryland has recognized that "an employer has an 'obligation to the public to use due care in selecting and retaining only competent and careful employees.'" *Jarvis v. Securitas Sec. Servs. USA, Inc.*, No. 11-cv-654-AW, 2012 WL 527597, at *6 (D. Md. Feb. 16, 2012) (quoting *Henley v. Prince George's Cnty.*, 60 Md. App. 24, 479 A.2d 1375, 1382 (Md. Ct. Spec. App. 1984)), *aff'd sub nom. Jarvis v. Contractor Securitas Sec.*, 474 F. App'x 271 (4th Cir. 2012).

Defendants argue preliminarily that this claim is superfluous and improper because Plaintiff is already alleging vicarious liability against Defendants PTS and Brevard for the misconduct of their employees. ECF No. 112-2 at 31. But a claim that an employer is vicariously liable for an employee's misconduct is different from a negligent hiring or supervision claim. "Under Maryland law, an employer's liability in this regard is not to be reckoned simply by the happening of the injurious event. Rather, there must be a showing that the employer failed to use reasonable care in making inquiries about the potential employee . . . or in supervising or training the employee." *Gay v. United States*, 739 F. Supp. 275, 277 (D. Md. 1990) (citing *Cramer v.*

24

*Housing Opportunities Comm'n*, 304 Md. 705, 501 A.2d 35 (1985)). "Unlike respondeat superior, which holds the employer vicariously liable for certain employee torts, this cause of action is based on the employer's breach of his duty of care, which is nondelegable." *Henley v. Prince George's Cty.*, 60 Md. App. 24, 36, 479 A.2d 1375, 1382 (1984), *aff'd in part, rev'd in part on other grounds*, 305 Md. 320, 503 A.2d 1333 (1986). Thus, this claim is not superfluous.

To state a claim for negligent hiring, training, or supervision, Plaintiff must show: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring, [training, or supervising the employee] . . . as the approximate cause of plaintiff's injuries." *Jarvis*, 2012 WL 527597, at *5 (citing *Latty v. St. Joseph's Soc. of Sacred Heart, Inc.*, 17 A.3d 155, 165 (Md. Ct. Spec. App. 2011)).

### 1.  Standard of Care

Defendants first argue that Plaintiff must also use expert testimony to establish an applicable "standard of care" as to the proper training and supervision of private transport employees. ECF No. 112-2 at 31. As described in Part A, in Maryland, expert testimony is generally required in a negligence action to establish the applicable "standard of care" for a profession, including in a negligent supervision, retention, or training claim. *See* Jones, 425 Md. at 26. However, expert testimony is not required when the negligent retention or supervision would be obvious to a reasonable jury member. *See id.* (holding that expert testimony was unnecessary for a negligent training claim against police officers because the jury need only "common knowledge or experience" to recognize Fourth Amendment violations) (quoting *Cent. Cab Co. v. Clarke*, 259 Md. 542, 551, 270 A.2d 662, 667 (1970)). Plaintiff is required to present

expert testimony because knowledge of adequate training and supervision here is not within common knowledge or experience.

Plaintiff has proffered the opinion of Ron McAndrew. As discussed in more detail in Part A, McAndrew is qualified to opine on the training and supervision of transport employees through his experiences, including as a supervisor and trainer. *See* ECF No. 118-15 at 3.

McAndrew opined that it is his professional opinion that "PTS and Brevard failed to train their transport agents on the proper use of chemical agents and the timely decontamination following their deployment." ECF No. 118-15 at 8.  McAndrew also opined, "It is further my professional opinion that PTS's failure to properly inventory and control chemical agents through proper accountability, violates the industry standards. Without accountability transport officers could utilize force against inmates without complying with PTS and Brevard's use of force reporting procedures." *Id.* In his deposition, McAndrew opined that the use of restraints "is a very serious part of the training" for guards and that it "takes at least a full day of training people on how to use handcuffs, leg irons, black boxes[.]" ECF No. 118-14 at 35.

McAndrew had adequately elaborated a standard of care as to the training and supervision of correctional officers. McAndrew has identified a sufficient basis for his opinions—his extensive experience and applicable regulations—and provided an opinion as to the training required. He also provided his opinion that Defendants had failed in meeting that standard of care. Any gaps or weakness in his testimony may be highlighted by cross-examination. *See Glass*, 38 F. Supp. 3d at 714. Thus, Plaintiff has adequately shown an applicable standard of care.

2.   **Substance of the Negligent Retention, Supervision, and Training Claim**

This Court turns to the substance of Plaintiff's negligent supervision, retention, and training claims. Plaintiff must establish the existence of an employment relationship, an employee's incompetence, employer's actual or constructive knowledge of such incompetence, an employee act or omission causing injury, and employer's negligence in training, retaining, or supervising the employee. *See Latty*, 198, Md. App. at 272 (citing *Horridge v. St. Mary's Cnty. Dept. of Soc. Servs.*, 382 Md. 170, 854 A.2d 1232, 1238 (Md. 2004)).

Defendants do not dispute the existence of an employment relationship between PTS and Brevard and Defendant Lebron, Santiago, King, and Cabrera, the guards responsible for transporting Plaintiff. ECF No. 112-2 at 32. Plaintiff has also shown that Defendant Lebron and the other guards may have been incompetent, as Plaintiff states that they frequently did not stop for bathroom breaks, used restraints and chemical agents unreasonably, did not ensure that the passengers were fed, drove erratically and dangerously, and frequently lacked any control over the passengers. *See* ECF No. 113-3 at 59, 65, 118, 128.

As to Defendants PTS and Brevard's negligence in supervising, retaining, or training the employees, Plaintiff has also met his burden. First, Plaintiff establishes a dispute about the adequacy of employee training. Jeanna's Act requires that transporting guards receive 100 hours of training in "use of restraints, searches, use of force, including use of appropriate weapons and firearms, CPR, map reading, and defensive driving[.]" 34 U.S.C § 60103(b); *see also* 28 C.F.R. § 97.12 ("Employee Training"). McAndrew also testified as to the seriousness of training regarding chemical agents and restraints. ECF Nos. 118-14 at 35, 118-15 at 8. In his deposition, Caruso testified that employees receive classroom training of 100 hours and are required to take examinations. ECF No. 118-7 at 38, 41. However, Defendant Lebron testified that he had never

received training on chemical agents or use of force as an employee. ECF No. 113-6 at 27.

Lebron did not recall if he did any classroom training. *Id.* at 28.[14] Cabrera testified that he did

about a week and a half of training, ECF No. 118-24 at 3, 4 (Cabrera Dep.), and King testified

that he may have had a week of training, ECF No. 118-25 at 3 (King Dep.). In all cases,

employees may not have completed the full training required.

In addition, Jeanna's Act imposes standards on how long guards may operate the

transport vehicles, 28 C.F.R. § 97.13, and requires the notification of law enforcement prior to

scheduled stops for food, bathrooms, or rest, 28 C.F.R. § 97.18. Plaintiff's recollections of the

trip, which are supported by the accounts of fellow passengers, raise questions as to whether PTS

and Brevard employees adhered to these standards and whether Defendants PTS and Brevard

adequately supervise their employees to ensure compliance. *See* ECF No. 115-8 at 3, 4 (gaps

between bathroom breaks and food breaks in the Activities Log); *see also* ECF No. 113-3 at 189

(recounting that the guards may have been driving for at least 18 hours at a time). Overall,

Plaintiff's account of the trip raises disputes of fact as to whether Defendants use "reasonable

care" in training and supervising their employees to ensure adherence to these guidelines, as well

in providing adequate care for their passengers.

Next, Plaintiff has also adequately demonstrated that the guards' incompetence may have

caused Plaintiff's injuries. A jury could determine both that the guards' negligence was a

"substantial factor" in Plaintiff's injuries, as the negligence arguably led directly to Plaintiff's

claimed physical and mental injuries, and that the injuries were "foreseeable," as it is reasonably

foreseeable that lack of training and supervision may lead to injury of passengers. *See Jones*, 425

---

[14] Lebron did state that he had received training on use of force and chemical agents during previous employment. *See* ECF No. 113-6 at 27, 28.

Md. at 33 (explaining that a plaintiff can establish causation by showing that negligent training was both a "substantial factor" in an injury and that injury was a "foreseeable result").

Finally, as to Defendants' knowledge of the incompetence, Plaintiff has also met his burden. Statements that the guards do not recall receiving basic training could lead a jury to the conclusion that Defendants knowingly allowed their employees to transport prisoners and pre-trail detainees with inadequate training. In addition, Plaintiff has demonstrated that Defendants may have also been aware of complaints of employee conduct by the number of lawsuits filed against them. *See* ECF No. 40 ¶¶ 87–104 (compiling a list of lawsuits against Defendants Brevard and PTS, including a lawsuit against Defendant Lebron in particular, alleging negligence and constitutional deprivations). Plaintiff also asserts that Defendants even encouraged negligent conduct among their employees, such as driving dangerously with little sleep, to "maximize [ ] profits." ECF No. 118-1 at 8.

It is true, as Defendants argue, that Plaintiff may not rely on generalized statements of negligence or misconduct and an employer's knowledge of that incompetence. *See Jarvis*, 2012 WL 527597, at *6 (dismissing negligent supervision and hiring claims because "Plaintiff alleges that Defendant was 'unfit and incompetent' but does not give a factual basis as to why"). But Plaintiff has made more than conclusory allegations. Instead, he has adduced evidence from which a jury could determine that at least three of the four guards that transported him may have lacked basic training; that the guards disregarded the basic care and needs of the passengers, as well as basic safety; that the guards did not comply with regulations promulgated under Jeanna's Act nor the general standard of care in the industry; and that PTS and Brevard were aware of employee incompetence because they allowed untrained employees to transport passengers. In addition, he argues that PTS and Brevard were aware of the incompetence given the litany of

complaints and lawsuits about prison transport conditions, including one lawsuit against

Defendant Lebron. Plaintiff also argues that PTS and Brevard may in fact encourage employees'

risky and cost-cutting behavior to increase their profits. Plaintiff has put the elements of

negligent supervision, retention, and training into dispute. Thus, summary judgment is denied on

this claim.

### C.  Constitutional Deprivation against Defendant Lebron

Section 1983 provides a remedy against any person who, under color of state law,

deprives another of rights protected by the United States Constitution. *See* 42 U.S.C. § 1983;

*City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 707, 119 S. Ct. 1624 (1999) ("Section 1983

authorizes a party who has been deprived of a federal right under the color of state law to seek

relief[.]'"")).[15]

The Eighth Amendment of the United States Constitution forbids punishment that

involves "the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173

(1976). The substantive due process clause of the Fourteenth Amendment prohibits punishment

of pre-trial detainees based on essentially the same principles as those applied under the Eighth

Amendment to post-conviction detainees. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Riley v.

Dorton*, 115 F. 3d 1159, 1166–67 (4th Cir. 1997), *abrogated on other grounds*, *Wilkins v.

Gaddy*, 559 U.S. 34 (2010).

---

[15] This constitutional deprivation claim is against Defendant Lebron in his personal capacity. Thus, Plaintiff does not need to establish that Defendants Brevard or PTS maintained unconstitutional policies or customs for this claim. *See* ECF No. 21 at 14 ("[I]t is well-recognized that there is no doctrine of respondeat superior in Section 1983 actions, and thus, PTS cannot be held directly liable for the alleged unconstitutional acts of its employees. Rather, Plaintiff can proceed only against the PTS employees in their personal capacities, or seek to establish that the employees were acting pursuant to an official policy or custom of PTS."). This Court has already held that Defendants PTS and Brevard perform a state function, and it has also bifurcated the Section 1983 claim against Defendants Brevard, PTS, and Lebron in an official capacity. *See* ECF No. 97 at 11.

The constitutional protections afforded to a pre-trial detainee as provided by the Fourteenth Amendment are at least co-extensive with those provided to convicted prisoners by the Eighth Amendment. *Christopher v. Warden Assistant Warden of Baltimore City Det. Ctr.*, No. 13-cv-1057-JFM, 2013 WL 1701464, at *1 (D. Md. Apr. 17, 2013) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)); *see also Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001) (noting that "the Fourteenth Amendment rights of pre-trial detainees 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'") (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *see also Burkey v. Baltimore Cty.*, No. 20-cv-2006-GJH, 2021 WL 3857814, at *5 (D. Md. Aug. 30, 2021). "Consequently, pretrial detainees have a clearly established right to the Eighth Amendment's restraints on 'cruel and unusual punishments' by prison officials[.]" *Sleeper v. City of Richmond Va.,* 2012 WL 3555412, at *6 (E.D. Va. Aug. 16, 2012); *see also Burkey*, 2021 WL 3857814, at *5; *Oladokun v. Maryland*, No. 14-cv-463-DKC, 2014 WL 7014511, at *7 (D. Md. Dec. 10, 2014) (claims challenging the "conditions of confinement imposed upon pretrial detainees are examined under the Due Process Clause of the Fourteenth Amendment[.]") (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

"However, not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017); *see also Best v. Baltimore Cty.*, No. 19-cv-2344-ELH, 2021 WL 878351, at *11 (D. Md. Mar. 9, 2021) (distinguishing between "deliberate indifference" and "excessive force" claims). "The deliberate indifference standard generally applies to cases alleging failures to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, or failing to render medical assistance."

31

*Thompson*, 878 F.3d at 98. In contrast, the "excessive force standard" applies to uses of force like excessively tight handcuffing, unreasonable use of chemical agents, and reckless driving. *See id.* at 98, 103. "This standard turns on the perspective of a reasonable officer and must account for the state's legitimate need to manage the correctional facility." *Coney v. Davis*, 809 F. App'x 158, 159 (4th Cir. 2020).

Here, Plaintiff's claims make up two different categories of constitutional deprivation: unconstitutional conditions of confinement and excessive force.[16] The Court examines each type of claim in turn as applied to Plaintiff's trip from Montgomery County, Maryland, to Plaintiff's drop-off in Hopkinsville, Kentucky—the trip that Defendant Lebron oversaw. ECF No. 115-8 at 3, 4. Finally, the Court addresses Defendant Lebron's broader argument that Plaintiff has not adequately shown that Lebron was responsible for any of the constitutional deprivations.

### 1. Conditions of Confinement

In considering a "conditions of confinement claim," a court must employ *Farmer*'s two-pronged "deliberate indifference" test, considering first whether there was "the deprivation of [a] basic human need [that] was objectively sufficiently serious[.]" *Best*, 2021 WL 878351, at *15 (citing *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995)); *see also Roberts v. Taniguchi*, No. 12-cv-1187-JKB, 2012 WL 5252288, at *5 (D. Md. Oct. 23, 2012) (a plaintiff must show "conditions which 'deprive inmates of the minimal civilized measure of life's necessities.'") (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981)).

---

[16] Plaintiff says that all of his claims are "conditions of confinement" claims, ECF No. 115-1 at 49, but his allegations regarding use of restraints, deployment of chemical agents, and dangerous driving are excessive force claims, even if they occurred during confinement. *See Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 100 (4th Cir. 2017); *see also Fletcher v. Dykes*, No. 17-cv-914, 2018 WL 3785143, at *5 (D. Md. Aug. 9, 2018).

Plaintiff must also show "evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). But "[j]ail employees may not ignore a dangerous condition of confinement on the ground that the complaining inmate shows no serious current symptoms." *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011) (citing *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 2480, 125 L. Ed. 2d 22 (1993)). Thus, constitutional harm also includes whether a pretrial detainee was exposed to "a substantial risk of harm." *Id.* The Fourth Circuit has "emphasiz[ed] that the correct standard to apply when considering the objective prong . . . is whether there is an 'extreme deprivation' and 'a serious or significant physical or emotional injury resulting from the challenged conditions' or . . . 'a substantial risk of such serious harm' resulting from . . . exposure to the challenged conditions." *Scinto v. Stansberry*, 841 F.3d 219, 229 n.3 (4th Cir. 2016) (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)).

Second, the court must determine whether a plaintiff has met the "subjective prong," or whether "'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" *Burkey*, 2021 WL 3857814, at *6 (quoting *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019), *as amended* (May 6, 2019)).[17] "[P]laintiff must establish that defendant exhibited deliberate or callous indifference to a specific known risk of harm." *Roberts*, 2012 WL 5252288, at *5 (citing *Pressly v. Hutto*, 816 F.2d 977, 979 (4h Cir. 1987)). Plaintiff must establish that "*subjectively*

---

[17] In *Burkey*, this Court noted that the circuits are split on whether a pre-trial detainee must satisfy the subjective prong for a deliberate indifference claim. "In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Court held that, unlike the standard applied to post-conviction detainees' excessive force claims under the Eighth Amendment, the standard for pre-trial detainees' excessive force claims under the Fourteenth Amendment includes no subjective component. In the wake of *Kingsley*, Circuit Courts have split regarding whether pre-trial detainees asserting deliberate indifference claims under the Fourteenth Amendment likewise need only meet the objective standard." *Burkey v. Baltimore Cty.*, No. 20-cv-2006-GJH, 2021 WL 3857814, at *6 (D. Md. Aug. 30, 2021) (citing *Mays v. Sprinkle*, 992 F.3d 295, 300-01 & n.4 (4th Cir. 2021)).

The Fourth Circuit has not resolved the issue since *Burkey*. Like in *Burkey*, this Court's conclusions do not turn on the subjective part of the analysis, and the results would be the same regardless of the standard applied.

[defendants] acted with a sufficiently culpable state of mind." *Id.* (quoting *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original)).

"A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence 'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Scinto*, 841 F.3d at 225 (quoting *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842)). During a summary judgment analysis, a court may "infer deliberate indifference" if an individual defendant fails to respond reasonably in the "face of a known, serious risk of harm[.]" *Scinto*, 842 F.3d at 230; *see also Burkey*, 2021 WL 3857814, at *9 n.7 ("'We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious.'"") (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

In addition to meeting both the objective and subject prongs, Plaintiff must demonstrate an injury or substantial risk of injury that is "more than de minimis[,]" *Robles v. Prince George's Cty. Maryland*, 302 F.3d 262, 269 (4th Cir. 2002), and, because this claim is against Defendant Lebron in his personal capacity, "the record must at least reflect a genuine dispute as to the specific defendant's involvement in causing the alleged injury[,]" *Burgess v. Baltimore Police Dep't*, No. 15-cv-834-RDB, 2017 WL 4947004, at *9 (D. Md. Oct. 31, 2017).[18]

---

[18] For the constitutional deprivation claims here, Plaintiff is not required to present expert testimony. "There is no requirement, however, that a plaintiff alleging deliberate indifference present expert testimony to support his allegations of serious injury or substantial risk of serious injury." *Scinto v. Stansberry*, 841 F.3d 219, 230 (4th Cir. 2016). "[W]hen the seriousness of an injury or illness and the risk of leaving that injury or illness untreated would be apparent to a layperson, expert testimony is not necessary to establish a deliberate indifference claim." *Id.*

Plaintiff argues that several deprivations make up his conditions-of-confinement claim.[19] He claims that his confinement was unsafe and unsanitary, that he was deprived of adequate water, food, sleep, and bathroom breaks, and that he was unprotected from violent behavior from other detainees and from injury. *See* ECF No. 115-1 at 16, 17, 23, 24.

i.     *Unsanitary conditions*

Plaintiff claims that when he was first taken to the van, "I was about knocked to my knees by the stench." ECF No. 113-3 at 44. Plaintiff describes the van as smelling like "defecation, urine, vomit, old food." *Id.* at 48. Plaintiff states that, because transportees were not allowed bathroom breaks, they frequently used their allocated water bottles to urinate, so bottles of urine were "rolling back and forth" around the van and that there was "pee on the floor, food, flies." *Id.* at 75; *see also* ECF No. 115-5 ¶ 17 (Loud Aff.) ("Throughout my entire transport, the water bottles filled with urine would roll around the back compartment of the van and were not regularly cleaned out by the guards."). Plaintiff states that he saw inmates vomiting, especially after another transportee defecated in the van. ECF No. 113-3 at 78. Plaintiff states that he himself was nauseated and ill because of the conditions in the van. *Id.* at 79.

Plaintiff states that, throughout the trip, he saw no effort to clean the van. *See* ECF No. 113-3 at 82; *see also* ECF No. 115-5 ¶ 21 (Loud Aff.) ("Leftover bags, wrapper, partially eaten food, bottles, and other trash would pile up in my compartment and in the back compartment and were not regularly cleaned out by the guards."). Plaintiff also states that he was not able to clean himself, even after another inmate defecated on him. ECF No. 113-3 at 74, 75. Loud, another

---

[19] As with his negligence claim, in support of his account of the trip, Plaintiff also provides affidavits from fellow passengers Michelle Loud, ECF No. 115-5, and David Thomas Spina, ECF No. 115-3. He also provides a notarized voluntary statement from passenger Timothy LaRoque. ECF No. 115-4. Plaintiff also provided the Activities Log of Santiago and Defendant Lebron for the period of December 19 to December 24.  ECF No. 115-8. Plaintiff also provided the deposition of Frank Caruso, the corporate designee of Brevard. ECF No. 118-7.

passenger on the van, supports this observation: "The smell in the van was terrible and often smelled like urine . . . There were no showers in the van." ECF No. 115-5 ¶¶ 18, 28. Plaintiff says that the van was crowded with 12 passengers who constantly fought over space. ECF No. 113-3 at 50.

Defendant Lebron contests these observations, stating that "we would clean . . . every jail stop, when they got out, one of us would go in there and empty stuff out[.]" ECF No. 113-6 at 179. However, Lebron notes that he would sometimes find water bottles filled with urine. *Id.* Lebron argues that while Plaintiff's trip was "generally uncomfortable," Plaintiff cannot show that the level of discomfort is unconstitutional, nor was Lebron was responsible for the conditions. ECF No. 113-2 at 14.

"The Constitution 'does not mandate comfortable prisons[.]" *Oladokun*, 2014 WL 7014511, at *8 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). But it is a "settled rule that housing inmates in a grossly overcrowded and unsanitary facility violates the inmates' rights to be free from cruel and unusual punishments." *Brown v. Mitchell*, 308 F. Supp. 2d 682, 693 (E.D. Va. 2004) (citing *Wilson v. Seiter*, 501 U.S. 294 (1991); *Strickler v. Waters*, 989 F.2d 1375 (4th Cir. 1993)). "Courts have repeatedly held that leaving a prisoner in a cell containing human waste is sufficiently dangerous to an inmate's health and safety as to satisfy the objective prong of this test." *Clark v. Daddysman*, No. 16-cv-0621, 2018 WL 1453333, at *10 (D. Md. Mar. 22, 2018) (citing *Williams v. Griffin*, 952 F.2d 820, 825 (4th Cir. 1991)); *see also Burkey*, 2021 WL 3857814, at *7 (continued exposure to sewage was sufficient to meet the objective prong); *Webb*, 423 F. App'x at 301 (collecting cases where courts held that unsanitary conditions, including exposure to sewage and human waste, exposed plaintiffs to substantial risk of harm); *Fletcher v. Dykes*, No. 17-cv-0914-TDC, 2018 WL 3785143, at *7 (D. Md. Aug. 9, 2018) (An "allegation of

a failure to issue eating utensils and sanitary items such as soap, which forced [plaintiff] to eat food with his unwashed hands after using the toilet, could raise hygiene concerns that implicate the Eighth Amendment and thus warrants additional factual development."). "[U]nsanitary conditions lasting for mere days may constitute an Eighth Amendment violation." *Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013).

Plaintiff has sufficiently demonstrated that he was exposed to and at risk of serious unsanitary conditions to meet the objective prong. Because he can point to evidence demonstrating that Defendant Lebron was aware of the unsanitary conditions and consistently failed to address them, he has also sufficiently stated the subjective prong as well. Thus, Plaintiff has met his burden.

       *ii.*      *Deprivation of food, water, heat, and sleep*

Plaintiff states that he was deprived of adequate food and water. *See* ECF No. 113-3 at 132, 133. Plaintiff states that food was provided by one of the guards handing a bag of food back to be passed around the entire van. *Id.* Plaintiff was given one bottle of water and one hamburger. *Id.* However, he was not given another meal on that part of his trip, a period spanning December 23 through the afternoon of December 24. *See id.* Plaintiff attests that he did not receive food because the drivers did not buy enough food, nor would they ensure every prisoner received a meal: "I probably missed two servings of food . . . the food is disbursed by the inmates and then we drive down the road, and sometimes I'd grab no burger at all[.]" *Id.* at 132–33; *see also* ECF No. 115-5 ¶ 22 (Loud Aff.) ("The guards would not supervise us eating and they did not stop and wait for us to eat."); ECF No. 115-3 ¶¶ 18, 19 (Spina Aff.) ("We would also be given bottles of water, though the water bottle distribution was pretty limited . . . There were times when the food would not get passed around to all of the prisoners. There were also times when the guards did

not buy enough food for everyone."). Plaintiff states that he complained about missing servings of food and was told that "it's not my problem" by Defendant Lebron and Santiago. ECF No. 113-3 at 133.

Plaintiff also alleges generally that he was subjected to cold temperatures. *See* ECF No. 115-1 at 50; *see also* ECF No. 115-3 ¶¶ 27, 28 (Spina Aff.) ("We were being transported during the winter, so it was very cold at night and there was what appeared to be frost on the van's ceiling."). Plaintiff states that he was sleep-deprived because the van drove through the night. *See* ECF No. 113-3 at 94.

In contrast, Defendant Lebron stated that inmates would receive water and food together. ECF No. 113-6 at 82. He stated that he would watch the prisoners pass the food around to ensure that everyone received a meal. *Id.* at 79. However, he conceded that the Activities Log showed no meals or water served for at least a 15-hour span. *See id.* at 108. In addition, Caruso testified that the vans were "usually stocked with blankets." ECF No. 118-7 at 25.

Prison officials have a duty to "'provide humane conditions of confinement . . . [and] ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Scinto,* 841 F.3d at 225 (quoting *Farmer*, 429 U.S. at 832). Inmates have a right to "nutritionally adequate food, prepared and served under conditions which do not present immediate danger to the health and well-being of the inmates who consume it." *Shrader v. White*, 761 F.2d 975, 986 (4th Cir. 1985) (internal quotations and citations omitted). In addition, "[p]risoners have a clearly established right to avoid being intentionally subjected to cold temperatures." *Fletcher*, 2018 WL 3785143, at *7 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325, 115 L. Ed. 2d 271 (1991)). Finally, "[c]ourts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights." *Tafari v. McCarthy*,

714 F. Supp. 2d 317, 367 (N.D.N.Y. 2010) (citing *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999)).

Plaintiff has adequately established disputes of fact as to constitutional deprivations of adequate food and water, and he has sufficiently shown that the conditions of consuming food and water were unsanitary, thus satisfying the objective prong. He has also adequately established Defendant Lebron's indifference to these food and water deprivations, satisfying the subjective prong. Plaintiff has not adequately shown, however, that lack of sleep rose to the level of a constitutional violation. Plaintiff has not shown "days" of lost sleep because of Defendant Lebron's custody of him. *See, e.g.*, *Harper v. Showers*, 174 F.3d 716, 717 (5th Cir. 1999) (that loss of sleep for "days at a time" sufficient to state a constitutional violation). In addition, he has not adequately shown that he was subjected to cold temperatures, *see Fletcher*, 2018 WL 3785143, at *7, nor has he shown that Defendant Lebron was aware of the temperature. Instead, he relies on other passengers' general observations of temperature. In addition, he does not refute the claim that the vans were usually stocked with blankets. Thus, Plaintiff may proceed on constitutional deprivation claims related to food and water deprivation but not sleep and temperature.[20]

### iii.    *Deprivation of bathroom facilities*

Plaintiff claims that he was deprived of the ability to regularly use the bathroom. *See* ECF No. 113-3 at 76; *see also* ECF No. 115-5 ¶ 15 (Loud Aff.). Plaintiff states that this lack of access to bathroom facilities meant that passengers were using their water bottles to urinate, contributing to the unsanitary environment. ECF No. 113-3 at 76. Plaintiff states that, at one point, he had to urinate into a bottle because he was denied bathroom access. *Id.* at 76. Plaintiff

---

[20] The Court also notes that there remains a genuine dispute of fact as to the number of meals that Plaintiff was served. *See* ECF No. 113-3 at 132; ECF No. 113-2 at 15.

claims that Defendant Lebron and Santiago denied bathroom requests and ordered inmates to instead urinate in bottles and, in one incident, defecate into a plastic bag. *See* ECF No. 113-3 at 56, 68; *see also* ECF No. 115-3 ¶ 17 (Spina Aff.) (Asserting that at least one guard "yelled at us to 'pee in the bottle.'"). Plaintiff claims that one guard, whom he asserts may have been Defendant Lebron, told a passenger to defecate into a plastic bag while the van was still driving. *See* ECF No. 113-3 at 68; *see also* ECF No. 115-3 ¶ 14 (Spina Aff.). Plaintiff attempted to help the other detainee and ended up covered in human waste. ECF No. 113-3 at 71.

In response, Defendant Lebron says that the van would stop every four hours for a bathroom break. ECF No. 113-6 at 82. Lebron also claims that he would take unscheduled stops to accommodate restroom requests but did not recall how often. *Id.* at 39. Defendant also points to the Activities Log and states that prisoners would be allowed to use the restroom every time they stopped a secure facility. *See* ECF No. 115-8 at 3, 4. However, Lebron conceded in his deposition that officials at the jail facilities sometimes did not consent to prisoners using the bathroom: "[Y]ou would check with the jail to see if everyone can get off. They may say no." ECF No. 113-6 at 129. Defendant Lebron also stated that sometimes, he would find bottles of urine in them while cleaning the van, *id.* at 35, but that he told prisoners that "you are not to pee in the bottles" at the beginning of every trip because "it was unsanitary and they're not supposed to," *id.* at 53, 83. Lebron also states that it is against policy to allow prisoners to defecate into containers. *Id.* at 84. Lebron also states that he has no recollection of telling an inmate to defecate into a bag or of that incident occurring. *See id.* at 50. Lebron states that the prisoners "complain all the time" but that he does not remember specific complaints. *Id.* at 52.

Adequate access to bathroom facilities is a human need. *See Hope v. Pelzer*, 536 U.S. 730, 738, 122 S. Ct. 2508, 2514, 153 L. Ed. 2d 666 (2002) (stating that "deprivation of bathroom

breaks . . . create[s] a risk of particular discomfort and humiliation[.]"); *see, e.g.*, *Houston v. PTS of Am.*, 2021 WL 1017120, at *10 (E.D. Wis. Mar. 17, 2021) ("Depriving an inmate of access to a bathroom for several hours to the point where the inmate is forced to defecate and urinate on the floor and sit in it sufficiently states a claim under the Eighth Amendment for screening purposes."). The Court finds that Plaintiff meets his burden on this claim. Plaintiff provides evidence that he was denied adequate opportunities to use the bathroom, that he requested bathroom access and was denied, and that, as a result, he was forced to sit in human waste and urinate into a bottle. Defendant's claims to the contrary only serve to demonstrate that there exists a genuine dispute of material fact making summary judgment inappropriate. Plaintiff has thus met the objective prong. He also states that Defendant Lebron ignored bathroom requests and ordered inmates to use bottles and bags instead, showing the subjective prong. Plaintiff may proceed on his conditions-of-confinement claim regarding this denial.

      *iv.*    *Deprivation of safety*

Plaintiff states that Defendant Lebron neglected his personal safety, which amounted to a constitutional deprivation. *See* ECF No. 115-1 at 50. In general, Plaintiff recounts a chaotic environment inside the van, with frequent fighting and aggression. Plaintiff says that there was a passenger who was "an instigator, trying to bully people." ECF No. 113-3 at 54. Plaintiff states that "there was a lot of fighting going on . . . hollering, spitting, headbutting." *Id.* at 65. Plaintiff said that he was headbutted and that he headbutted the person back in defense. *Id.* Plaintiff also states that he fell out of the van upon arriving in Charleston, West Virginia, because his legs had fallen asleep and because he was still restrained. ECF No. 113-3 at 61. Plaintiff slipped and fell hard on his shoulder. *Id.* The guards offered no help. *See id.*

"The Constitution requires prison officials to ensure 'reasonable safety,' a standard that acknowledges prison officials' 'unenviable task of keeping [sometimes] dangerous [people] in safe custody under humane conditions[.]'" *Bost v. Wexford Health Sources, Inc.*, No. 15-cv-3278-ELH, 2018 WL 3539819, at *22 (D. Md. July 23, 2018) (quoting *Farmer v. Brennan*, 511 U.S. 825, 845, 114 S. Ct. 1970, 1983, 128 L. Ed. 2d 811 (1994)). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Roberts*, 2012 WL 5252288, at *5 ("In order to prevail on a claim of failure to protect from violence, plaintiff must establish that defendant exhibited deliberate or callous indifference to a specific known risk of harm.") (citing *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987)).

Plaintiff's evidence does not rise to the level of objective harm required. He does not state that he was targeted or at particular risk of harm. In addition, he cannot satisfy the subjective prong because he does not suggest that Defendant Lebron knew he was a target for violence or that he was "unduly vulnerable or at a known risk for harm" by fellow passengers. *See Roberts*, 2012 WL 5252288, at *5 (There was nothing to suggest "that [Defendants] knew or had reason to know that [Plaintiff] was targeted for assault, or that he was unduly vulnerable or at a known risk for harm by his fellow detainees."). Plaintiff, at most, "states a claim of negligence." *Id.* Without more, particularly claims of vulnerability or targeting by fellow inmates, Plaintiff's claim does not rise to a constitutional deprivation. In addition, Plaintiff has not shown a constitutional deprivation related to his fall from the van. He has not said that he was at particular risk of falling. At most, the claim is for negligence.

Finally, Defendant makes two general arguments in response to Plaintiff's conditions of confinement claims. First, Defendant argues that Plaintiff has only shown "general discomfort" that is "insufficient to allege a constitutional injury." ECF No. 113-2 at 14. Defendant argues that, whatever Plaintiff's allegations, Lebron was only involved for "less than two days," and thus, Plaintiff cannot establish constitutional deprivation. *Id.* at 7. It is true that courts have found that "a short period of exposure to . . . waste will not amount to a constitutional violation," such as a period of a few hours. *See Burkey*, WL 3857814, at *7 (citing *Prellwitz v. Anderson*, 2007 WL 2033804, at *2–3 (D. Minn. July 12, 2007) (granting motion to dismiss under 28 U.S.C. § 1915A(b) where wastewater on cell floor lasted only three hours and odor of inoperable toilet lasted six hours)). It is also true that conditions of confinement may be considered restrictive and harsh. *See Farmer*, 511 U.S. at 833.

 But prison conditions must also be humane. *See Farmer*, 511 U.S. at 833 (1994). Conditions are judged against the "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 598, 2 L. Ed. 2d 630 (1958)). A day spent in an enclosed, unsanitary space is not an insignificant period. *See Williams*, 952 F.2d at 824; *Walker*, 616 F.3d at 127 (noting that unsanitary conditions and denial of adequate hygiene products even for "mere days" can constitute an Eighth Amendment violation); *Putman v. Gerloff*, 639 F.2d 415, 418, 420 (8th Cir. 1981) (allegations that guards chained and denied bathroom access to pre-trial detainees overnight was sufficient to state a constitutional violation); *see also Robles v. Prince George's Cty., Maryland,* 302 F.3d 262, 269 (4th Cir. 2002) (tying an arrestee to a metal pole in a deserted parking lot for ten minutes was a Fourteenth Amendment violation).

While Plaintiff's individual claims standing alone are sufficient, a "conditions of confinement claim" analysis also "requires that each thread in the fabric of challenged conditions be isolated, yet judged with an appreciation of its interdependent existence." *Dawson v. Kendrick*, 527 F. Supp. 1252, 1285 (S.D.W. Va. 1981) (citing *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)). "That a totality of prison conditions can be combined to show an Eighth Amendment violation is a proposition established in many cases." *Williams*, 952 F.2d at 824. "'Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise[.]'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). Here, Plaintiff has sufficiently shown that a combination of the alleged conditions had the "mutually enforcing effect" of the deprivation of several human needs, including food and water, toilet facilities, and hygiene. *See, e.g.*, *Kovari*, 461 F. Supp. 3d at 382 (finding that "spending the better part of two weeks in a cramped 'cage,' amidst human waste, in the back of a hot van, driving erratically, with few breaks, for up to several days at a time, constitutes inhumane conditions.").

Second, Defendant argues that Plaintiff did not adequately show that Plaintiff suffered harm from the conditions. *See* ECF No. 113-2 at 20. But a plaintiff need not show "that she in fact suffered serious harm to prevail on this prong because 'the Eighth Amendment protects against future harm.' Courts have 'plainly recognized that a remedy for unsafe conditions need not await a tragic event.'" *Thompson*, 878 F.3d at 107 (quoting *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993)). "Thus, 'a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year' violates the Eighth Amendment, even if 'the complaining inmate shows no serious current symptoms.'" *Clark*, 2018 WL

1453333, at *10 (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 2480, 125 L. Ed. 2d 22 (1993)).

Here, there are sufficient facts to show that there was a substantial risk that Plaintiff would suffer serious harm. He attests to seriously unsanitary conditions combined with lack of adequate food, water, and bathroom access. A reasonable jury could find either the existence of serious harm or a substantial risk that Plaintiff could have suffered serious harm. In addition, Plaintiff says that he still has trouble sleeping, depression, and nightmares after his trip. *See* ECF No. 113-3 at 186, 192.[21]

In summary, the Court finds that Plaintiff has established disputes of fact sufficient to support a "conditions of confinement" claim regarding his allegations of unsanitary conditions, food and water deprivation, and deprivation of bathroom facilities.

### 2. Excessive Force

Plaintiff brings several claims that are some variation of an excessive force claim: that Defendant Lebron drove dangerously, *see* ECF No. 115-1 at 42, that Defendant Lebron placed excessively tight handcuffs on Plaintiff, *see id.* at 45, and that Defendant Lebron unreasonably used chemical agents, *see id.* at 48, 50.

To succeed on an excessive force claim, a pre-trial detainee "'must show only that the force purposely or knowingly used against him was objectively unreasonable.'" *Coney*, 809 F. App'x at 159 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97, 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015)). A court must consider factors such as "the relationship between the need for the use of force and the amount of force used," "the extent of the plaintiff's injury[,]" and "any effort made by the officer to temper or to limit the amount of force." *Kingsley*, 576 U.S.

---

[21] Plaintiff also offers testimony of Dr. Susan Feister, a psychiatrist, to attest to his symptoms of Post-Traumatic Stress Disorder, depression, and anxiety stemming from the trip. *See* ECF No. 115-9 (Fiester Report).

at 397. The court also should consider "the severity of the security problem at issue," "the threat reasonably perceived by the officer[,] and whether the plaintiff was actively resisting." *Id.* A plaintiff must "demonstrate that the officer used a 'nontrivial' amount of force . . . [but] violation can occur even if that force did not cause serious injury." *Fletcher*, 2018 WL 3785143, at *5 (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010)).

A pre-trial detainee plaintiff need not show subjective intent. *See Kingsley*, 576 U.S. at 397; *Coney*, 809 F. App'x at 159 (noting that "the state does not have the authority to punish such detainees."). Instead, as long as the force was used deliberately and not "accidentally or negligently," the analysis is purely objective. *See id.* "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.*; *see also Coney*, 809 F. App'x at 159; *Burkey*, 2021 WL 3857814, at *6 (noting the lack of subjective component in a pre-trial detainee's excessive force claim). "This standard turns on the perspective of a reasonable officer and must account for the state's legitimate need to manage the correctional facility." *Coney*, 809 F. App'x at 159. The claim must rise above negligence: "[A]s we have stated, 'liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.'" *Kingsley*, 576 U.S. at 396 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 834, 118 S. Ct. 1708, 1710–11, 140 L. Ed. 2d 1043 (1998)); *see also Thompson v. Opoku*, No. 18-cv-1022-ELH, 2020 WL 978681, at *16 (D. Md. Feb. 28, 2020), *appeal dismissed*, 837 F. App'x 995 (4th Cir. 2021) (noting that a pre-trial detainee "may prevail upon evidence that the use of force is deliberate – i.e., purposeful or knowing.") (internal quotations omitted).[22]

---

[22] The Supreme Court has explained that, with excessive force claims, there are "two separate state-of-mind questions. The first concerns the defendant's state of mind with respect to his physical acts—i.e., his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was 'excessive.'" *Kingsley v. Hendrickson*, 576

i.    *Reckless driving*

Plaintiff states that Defendant Lebron's reckless driving placed him at risk of harm. *See* ECF No. 115-1 at 42. Plaintiff states that Defendant Lebron sped excessively while driving and swerved dangerously. *See* ECF No. 113-3 at 189. Because the van had open seating on aluminum benches with no seatbelts, Plaintiff stated that sometimes, he would fall out of his seat and "someone would try to grab your seat[.]" *Id.* at 50, 195; *see also* ECF No. 115-3 ¶ 21 (Spina Aff.) ("Because we were not wearing seatbelts, we would be thrown off the benches and into each other[.]"). Plaintiff also offers GPS data that shows that the van reached speeds of 97 miles per hour and often went between 75 and 95 miles per hour. *See* ECF No. 115-11 at 6, 19. Plaintiff recalls that he and other passengers complained about the reckless driving. *See* ECF No. 113-3 at 194, 195.

A plaintiff may bring a claim of excessive force for reckless and dangerous driving: "'intentionally erratic driving [is] simply a different means of effectuating the same constitutional violation.'" *Brooks v. Johnson*, 924 F.3d 104, 119 (4th Cir. 2019) (quoting *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 102 (4th Cir. 2017)). In the reckless driving cases this Court found, the claims were brought by prisoners. *See Thompson*, 878 F.3d at 107 (collecting cases to show that prisoner allegations of reckless driving must rise above "mere negligence" and encompass "malice or even recklessness"); *see also Scott v. Becher*, 736 F. App'x 130, 133 (6th Cir. 2018) (allegations that an officer "was driving above the speed limit, swerving, and generally driving recklessly" and "[w]hen [inmates] beg[ged] him to slow down, before [they] all die[d], he refused, laughed, and instead accelerated" stated an Eighth Amendment violation). In those cases, the court applied the subjective intent standard to

---

U.S. 389, 395, 135 S. Ct. 2466, 2472, 192 L. Ed. 2d 416 (2015). Only the first inquiry applies to pre-trial detainees. *Id.*

determine whether the driving was used "'maliciously' and for the 'very purpose of causing harm'" to prisoners. *Brooks*, 924 F.3d at 113 (quoting *Whitley*, 475 U.S. at 320). Here, the Court must use the principles of "objective reasonableness," and thus determine whether the force itself was applied deliberately and whether the force was objectively unreasonable—a standard that is more than negligence. *See Kingsley*, 576 U.S. at 396 (explaining that "if an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim.").

Under this objective standard, Plaintiff has not shown a constitutional deprivation. Plaintiff has not shown that the "force" applied was knowing or purposeful. Plaintiff says that Lebron was speeding to complete pick-ups and drop-offs in a shorter period of time. *See* ECF No. 115-1 at 9 (stating that the vans take "long, circuitous, and indirect" routes so that PTS and Brevard can "maximize their profits"). The "force" applied—Plaintiff being thrown out of his seat by the driving—was not "purposeful or knowing." The force was a byproduct of Lebron's speeding and is negligence, which is not actionable under Section 1983. Plaintiff also does not show that Lebron drove recklessly to punish, to enforce order, or with malice, which would also support a showing of "purposeful or knowing" force. In addition, the mere fact that the van lacked seatbelts does not establish an excessive force claim. *See, e.g.*, *Brown v. Walton*, 2018 WL 3946534, at *3 (E.D. Va. Aug. 16, 2018) (citing *Jabbar v. Fischer*, 683 F.3d 54, 58 (2d Cir. 2012)). Thus, Plaintiff may not proceed on his excessive force claim regarding reckless driving.

### ii. *Excessively tight restraints*

Plaintiff claims that his excessively tight restraints amounted to cruel and unusual punishment. *See* ECF No. 115-1 at 45. Plaintiff states that, upon being put in restraints in Maryland, he immediately complained and told the guards that the restraints were painfully tight.

ECF No. 113-3 at 41. The guards told him to "shut up and get in the van[.]" *Id.* at 44. Plaintiff

was told that he would "get used to it." *Id.* at 42. Plaintiff recalls that his hands turned "purple

and yellow" and that the guards did loosen his restraints "after we got down the road a bit" but

that it was not sufficient. *Id.* Plaintiff claims that, "[t]hroughout the duration" of the trip, he

requested a loosening of the handcuffs. *Id.* at 43. He notes that while "there may have been an

adjustment sometime," it was never enough to relieve pressure on his hands. *Id.* at 63. Plaintiff

states that, by the time the van arrived in Hopkinsville, Kentucky, his hands had "purple and blue

rings around both wrists." *Id.* at 88. His hands were "numb and tingly." *Id.* He says that he still

suffers from loss of sensation and limited mobility in one hand. *Id.* at 159.

In response, Defendant argues that Plaintiff has not shown that Lebron applied the

restraints, nor that, even if Lebron did, the restraints were applied with malicious or punitive

intent. *See* ECF No. 113-2 at 19. In his deposition, Lebron also recalled that he normally tested

handcuffs to make sure that they are not too tight. ECF No. 113-6 at 31.

"In some circumstances, unduly tight handcuffing can constitute excessive force where a

plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a

plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight."

*Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (collecting cases from the Sixth,

Seventh, and Ninth Circuits); *Thompson*, 878 F.3d at 104 (collecting cases where excessive use

of restraints "without any apparent reason constitutes an unnecessary infliction of pain").

Plaintiff can proceed on his claim regarding excessively tight restraints. Plaintiff was

tightly restrained for a day and claims he had visible injuries on his hands. He also claims that he

requested relief repeatedly during the journey. He claims continued damage to his hands.

The cases cited by Defendant are distinguishable. In both, the court looked at excessive force claims as applied to prisoners. *See Montgomery v. Bishop*, No. 15-cv-1345-ELH, 2015 WL 2450979, at *2 (D. Md. May 21, 2015) (An inmate failed to overcome his burden when he did "not claim the restraints were applied or maintained with malicious or sadistic intent."); *Mills v. Ghee*, No. 06-cv-2313-DKC, 2011 WL 4352120, at *5 (D. Md. Sept. 15, 2011) ("Plaintiff alleges simply that the Defendants applied the restraints too tightly which caused him harm. He does not allege that they intended to do so."). As the Court has explained, Plaintiff was a pre-trial detainee whose claims are held to an objective reasonableness standard. In addition, Plaintiff was held in tight restraints for a much longer period, as the plaintiffs in the cited cases were held in restraints for short periods while being transported within Maryland. Here, there are genuine disputes of fact as to the objective reasonableness of the tightness of the restraints.

### iii.   Unreasonable use of chemical agents

Plaintiff also claims that an indiscriminate use of pepper spray violated his rights. Plaintiff attests that, at some point during the trip, Defendant Lebron and Santiago pulled over when the detainees were fighting and sprayed chemical agents into the back of the van. *See* ECF No. 113-3 at 117. Plaintiff says he suddenly experienced "burning sensation" and "fire coming into my eyes." *Id.* Plaintiff states that he had a burning sensation in his eyes for about 30 minutes and that no water or medical help was offered. *Id.* at 118.

Defendant Lebron states that he did not recall ever dispersing a chemical agent inside the van and stated that, according to company policy, there should be a record of it. ECF No. 113-6 at 50. However, he argues that, according to Plaintiff's allegations, a fight had broken out in the back of the van and argues using a chemical agent to disburse the fight would be appropriate. *See* ECF No. 123 at 8.

The Fourth Circuit has held that "'[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.'" *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)). There are "three general categories" in which "courts have held that use of pepper spray or other chemical agents may constitute excessive force[,]" which are "when an officer used far more than a reasonable quantity of a chemical agent[,]" when "a chemical agent was used without a prior verbal order, or after a prisoner had been subdued or had become compliant[,]" or when "after a prisoner is pepper sprayed (even for a legitimate reason), officers then withhold appropriate medical attention." *Wheeler v. Fritz*, No. 14-cv-2727-RDB, 2015 WL 4485436, at *10 (D. Md. July 20, 2015) (collecting cases); *see also Iko*, 535 F.3d at 240 (finding an "inference" of a constitutional deprivation because "the amount of force used was disproportionate to the need for force" and the officers neglected to give any medical attention.); *Duff v. Potter*, 665 F. App'x 242, 244 (4th Cir. 2016) (summary judgment was not appropriate when there were outstanding issues as to the "need for the use of force and how much force was used, extent of . . . injuries, any effort made by an officer to limit the amount of force used, the threat reasonably perceived by the officers, and whether [plaintiff] was actively resisting.").

Plaintiff can proceed on his excessive force claim regarding the use of chemical agents. While Plaintiff admits that some of the detainees were fighting, Plaintiff has established a genuine dispute of fact as to the objective reasonableness of indiscriminately spraying all passengers of the van and then denying any medical attention or ability to wash. A fight on the van, if one occurred, could certainly support the use of force to restore order. *Iko*, 535 F.3d at 239 (chemical agents may be used in a good faith effort to maintain or restore discipline). But

genuine disputes of fact remain as to the objective reasonableness of the use of pepper spray in response to the fight, which require credibility determinations that are not appropriate for resolution on summary judgment. *See Thompson*, 2020 WL 978681, at \*19 ("Where, as here, defendants offer no justification for the alleged application of force or deny there was an application of force, there exists a genuine dispute of material fact that requires credibility determinations not appropriate for resolution on summary judgment.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986)).

### 3. Defendant Lebron's Personal Responsibility

Defendant Lebron argues that there is no evidence that Lebron "caused or participated" in any of the alleged constitutional deprivations. *See* ECF No. 113-2 at 3, 17. "In a § 1983 personal or individual capacity suit, a plaintiff must show that the official charged personally caused the deprivation of his federal rights." *Roberts v. Prince George's Cty., MD*, 157 F. Supp. 2d 607, 609 (D. Md. 2001) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). To defeat a motion for summary judgment, the record must reflect a genuine dispute of fact as to a particular defendant's involvement. *See Burgess*, 2017 WL 4947004, at \*9.

Defendant Lebron was one of two employees driving the van, and thus he was one of just two employees responsible for the custody and transportation of Plaintiff. Plaintiff has stated that Defendant Lebron was aware of the constitutional deprivations during the trip. Multiple genuine disputes of material fact remain as to the extent of culpability of Defendant Lebron, many of which cannot be resolved without an assessment of credibility of witnesses. A reasonable jury could conclude that Defendant Lebron exhibited deliberate indifference to these unsanitary and unsafe conditions in the van. Plaintiff states that he repeatedly brought issues to the attention of Defendant Lebron and, moreover, this Court can infer that the risk of allowing inmates to sit

covered in waste while not allowing adequate opportunities for using the bathroom or eating would be obvious.

In *Roberts*, which Defendant Lebron relies on for support, the court dismissed the plaintiff's claims because the plaintiff "does not produce evidence that both [officers] committed the alleged constitutional violation, that both were present when it occurred, or that one stood idly by while the other committed the violation." *Roberts*, 157 F. Supp. 2d at 609. But here, Plaintiff does show facts to establish Defendant Lebron's involvement: he states that Lebron was directly involved in some of the constitutional deprivations, such as denial of bathroom breaks and indifference to providing adequate food and water to the passengers; he states that he complained to both guards, one of whom was Defendant Lebron, about his excessively tight handcuffs; he states that both officers were present for the majority of the trip,[23] including upon collecting him and placing restraints on him; and he states that both officers came to the back of the van and deployed pepper spray.[24]

Plaintiff has thus met his burden in establishing a dispute of fact as to the personal responsibility of Defendant Lebron. *See Ramachandran v. Nottolini*, 902 F. Supp. 158, 159 (N.D. Ill. 1995) (explaining that the "'personal responsibility' requirement is satisfied if an official . . . acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.'") (quoting *Maltby v. Winston*, 36 F.3d 548, 559 (7th Cir. 1994) (citations omitted), *cert. denied*, 515 U.S. 1141, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995)).

---

[23] As noted earlier, whether Defendant Lebron or Santiago departed the trip 90 minutes before the van arrived at Plaintiff's first destination is disputed. *See* ECF No. 113-3 at 115.

[24] Plaintiff did not state that both officers deployed a chemical agent. However, he did state that both officers left the front of the van and stood at the back of the van's open doors as chemical agent was deployed into the van. *See* ECF No. 113-3 at 117.

\* \* \*

In summary, Plaintiff's allegations are similar to other cases where a court found that a plaintiff had sufficiently shown constitutional injuries from inhumane conditions and excessive force. *See, e.g.*, *Williams*, 952 F.2d at 825 (finding that allegations of overcrowding, sewage flooding, deprivation of blankets, and insect and vermin infestation were sufficient to allege deprivation of human necessities, "thereby rendering the cumulative effect of the prison conditions unconstitutional"); *Dawson*, 527 F. Supp. at 1288 (finding that inadequate plumbing, failure to provide functioning lighting fixtures, and denial of clean bedding and clothing constituted constitutional violations); *Burkey*, 2021 WL 3857814, at \*7 (finding that plaintiff could overcome summary judgment when he said that he received spoiled food, was exposed to raw sewage for several days, and was deprived of the ability to exercise); *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (allegations that a plaintiff "was denied adequate access to water and a restroom, and forced to maintain an uncomfortable position for an extended period of time, subjecting him to a significant risk of wrist and arm problems, dehydration and thirst, and pain and damage to the bladder . . . constitutes a denial of the minimal civilized measures of life's necessities."); *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 908 (8th Cir. 2020) (a reasonable jury could find that conditions of confinement were unconstitutional when plaintiff alleged that "he was shackled and transported for eight days in foul conditions resulting in sores, infections, and loss of liberty, when all that was necessary was a 17 hour drive."); *see also Webb*, 423 F. App'x at 301 (collecting cases where "unsanitary conditions, the spread of disease, an increased risk of violence, and lack of access to medical care" were sufficient to allege an Eighth Amendment claim).

Thus, summary judgment on Plaintiff's Section 1983 claim against Defendant Lebron in a personal capacity is denied as to Plaintiff's claims of unsanitary conditions, inadequate food, water, and bathroom breaks, unreasonable use of chemical agents, and excessively tight restraints.

## IV.     CONCLUSION

For the reasons discussed, summary judgment is denied on the negligence claims against Defendants PTS, Brevard, and Lebron. Summary judgment is also denied on the negligent supervision and training claims against Defendants PTS and Brevard. Summary judgment is granted in part and denied in part as to the constitutional deprivation claims against Defendant Lebron in a personal capacity. A separate Order follows.


Dated:  March    11,  2022                                  /s/_____
                                                            GEORGE J. HAZEL
                                                            United States District Judge